**HARDAWAY CONSTRUCTION COMPANY, INC., Plaintiff–Appellee,**

v.

**UNITED STATES of America, Defendant–Appellant.**

No. 87–5762.

United States Court of Appeals, Sixth Circuit.

Argued April 5, 1988.

Decided July 20, 1988.

Elaine F. Ferris, argued, Michael Paup, Richard Farber, William S. Rose, Jr. and Gregory L. Nelson, Tax Div., Dept. of Justice, Washington, D.C., and Joe B. Brown, U.S. Atty., Nashville, Tenn., for defendant-appellant.

Jeffrey A. Greene, argued, and Craig V. Gabbert, Harwell, Barr, Martin, Stegall, Nashville, Tenn., for plaintiff-appellee.

Before MARTIN, WELLFORD and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This is a tax case that arose out of a somewhat unusual set of facts. In its federal income tax return for 1974 the taxpayer reported—and paid taxes on—an income item of more than $100,000 that was accrued on the taxpayer's books in that year but was not actually received. The government has stipulated that this item was "properly reported" as income in 1974. In 1975 it became clear, according to the taxpayer, that the income in question—part of a builder's fee provided for in a construction contract—would never materialize. In an amended return for 1975, therefore, the taxpayer took a deduction for the amount previously reported as income. The Internal Revenue Service disallowed the deduction, contending that no loss was actually sustained in 1975.

The validity of the government's position depends on how the construction contract, which is governed by the law of Tennessee, ought to be interpreted. If the contract created an unconditional right to receipt of the builder's fee, as the government contends, the taxpayer loses; the taxpayer admittedly made no effort to collect the fee, and if the taxpayer had a matured right to the money, it could not claim a loss without having attempted to enforce that right. If the contract created only a conditional right to the fee, on the other hand, as the taxpayer contends, the taxpayer wins; all possibility that the "condition" would be met disappeared in 1975, and

under the taxpayer's interpretation of the contract there was nothing to enforce. If the fee was properly reported as income in 1974, it was as surely "lost" in 1975, under the taxpayer's interpretation of the contract, as it would have been under the government's interpretation if, for example, the obligation to pay the fee had been totally discharged in bankruptcy.

Judge C.G. Neese, an experienced judge from the Eastern District of Tennessee sitting by designation in the Middle District of Tennessee, entered summary judgment in favor of the taxpayer. (The opinion is reported at 661 F.Supp. 153 (M.D.Tenn. 1987).) We cannot say that the interpretation of the contract reflected in the district court's judgment was erroneous, as a matter of Tennessee law, and we shall affirm the judgment.

## I

Under date of September 29, 1971, Mr. Paul Hardaway, Jr., one of the owners of Hardaway Construction Company, Inc. (the taxpayer in this case), signed a letter agreement prepared by the representative of five individuals (known as "Investment Associates") who held an option for the purchase of a 28–acre building site. The letter memorialized the following understandings, among others:

—Contingent upon financing being secured, Investment Associates would enter into a partnership agreement with Mr. Hardaway and/or his associates;

—The partnership would acquire ownership of the 28–acre site and a 350–unit apartment complex to be built thereon;

—Hardaway Construction Company would build the apartment complex for not more than $5,386,000, "including an agreed upon builder's fee of $175,-000;" Investment Associates, for their part, would be responsible for the cost of land acquisition, construction loan interest, and all other expenses;

—The construction contract between the partnership and Hardaway Construction Company would specify that

"$136,000 shall be retained until the closing of the permanent loan and paid at that time if funds are available. Should funds not be available to pay the entire amount, [Hardaway Construction] would agree to take a note from Investment Associates for any shortage. Any such shortage would be made up by Investment Associates assigning to [Hardaway Construction] their portion of any construction costs savings, any excess rents during construction, and all cash flow or income from any source from the development until such time as the note is fully paid. In effect, this $136,000 shall represent the 'contingency' in non-construction cost items. Investment Associates agrees not to withdraw any money from the development until [Hardaway Construction's] entire contract amount has been paid in full."

At the end of 1971, a commitment for permanent financing having been obtained, Mr. Hardaway and his father, along with the Investment Associates people and three other individuals, formed a Tennessee partnership to develop the apartment complex. The partnership agreement reflected an understanding that the partnership would obtain permanent financing in the amount of $5,250,000 from United Mutual Savings Bank, and the agreement recited that the partnership would enter into a construction contract with Hardaway Construction Company. In keeping with the letter agreement of September 29, 1971, the partnership agreement provided as follows:

"The construction contract with Hardaway Construction Company, Inc. shall specify that One Hundred Thirty Six Thousand ($136,000.00) Dollars shall be retained until the permanent loan to the partnership by United Mutual Savings Bank in the amount of Five Million Two Hundred Fifty Thousand ($5,250,000.00) Dollars is closed; and the One Hundred Thirty Six Thousand ($136,000.00) Dollars shall be paid to the construction company at that time if funds are available. In the event that immediately after said permanent loan closing, such funds are not available, the partners agree that a promissory note in the prin-

cipal amount of such shortage with interest at the rate of Four (4%) percent per annum shall be made payable to Hardaway Construction Company, Inc., and this note shall be the obligation of [Investment Associates.]"

In March of 1972, as previously agreed, the partnership entered into a cost reimbursement-plus-fee construction contract with Hardaway Construction Company. That contract, prepared on a standard form of the American Institute of Architects, obligated Hardaway Construction Company to build the apartment complex at a maximum cost, including contractor's fee, guaranteed not to exceed $5,386,000. Article 7 of the contract, which contained a cross-reference to Article 15, provided for a contractor's fee in the total amount of $175,000. Article 15 provided for monthly payments to Hardaway Construction Company, and added that "$136,000.00 of [the] fee shall be retained until the closing of the permanent loan."[1]

Hardaway Construction Company completed the apartment project during its 1974 fiscal year and, as has been stipulated, "properly reported the $175,000.00 builder's fee as gross income in that fiscal year." The permanent financing commitment from United Mutual Savings Bank lapsed, however, because of construction delays and other factors, and the partnership was unable to obtain permanent financing elsewhere. Only a portion of the agreed builder's fee was actually paid; the retainage (which, because of an accounting error, appears to have been only $110,777) was not paid.

Hardaway Construction Company and the partnership did not interpret their contract as obligating the partnership to pay the retainage without a permanent loan having been closed. Hardaway Construction made no demand for payment and instituted no legal proceedings to compel payment, notwithstanding that the individual members of the partnership would have

been good for the money if it was in fact due.

Having reported and paid taxes on $110,-777 of non-existent income, as Hardaway Construction saw it, the company initially tried to make itself whole by claiming a "bad debt" deduction on its 1977 return. The deduction was disallowed, and the controversy wound up in litigation before the same district court that decided the present case.

An agreed order of judgment was entered in favor of the government. The judgment entry in the initial lawsuit took note of the taxpayer's contention that "the builder's fee was contingent upon the contract owner closing permanent financing for the project," and went on to declare that "the last chance to obtain permanent financing for the project occurred during [Hardaway Construction's] fiscal year ending September 30, 1975." Because the contingency, if there was one, was foreclosed in 1975, there could not be a deduction in 1977.

The judgment thus having established that the loss, if there was a loss, could only have been sustained in fiscal year 1975, Hardaway Construction Company amended its 1975 return to claim a deduction in respect of the unpaid builder's fee as a "loss" deductible under 26 U.S.C. § 165 or as a "worthless debt" deductible under 26 U.S.C. § 166. Again the deduction was disallowed by the Internal Revenue Service. Again Hardaway Construction brought suit. The case was submitted to the district court for decision on cross-motions for summary judgment. This time the taxpayer won.

Noting at the outset of its opinion that "[t]he taxpayer contends that the payment of [the $136,000] fee was contingent upon the concluding by the owner ... of permanent financing [for the project,]" and stating that "[i]t is agreed by the parties that the last opportunity such owner had to obtain permanent financing for such project elapsed in the taxpayer's fiscal year

1. The parties to this litigation have stipulated that the intent of the construction contract "with respect to the nature of the $136,000.00 portion of the builder's fee and the terms of its repayment is reflected by the terms of the September 29, 1971, letter agreement."

which ended September 30, 1975," the district court decided, after reviewing the judgment in the earlier litigation, that the claimed deduction ought to be allowed under 26 U.S.C. § 165(a) as an uncompensated loss sustained during 1975. (Section 165(a) provides that "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.") 661 F.Supp. at 153–54. From a final judgment awarding Hardaway Construction Company a tax refund in the amount of $53,172.96, plus interest, the government has appealed.

## II

Challenging the taxpayer's contention that the right to receive the retained portion of the builder's fee was contingent upon the closing of a permanent loan, the government insists that the partnership was obligated to pay the full amount of the fee, following completion of the apartment project, whether or not a permanent loan was ever closed. If that is what the contract provided, there can be no question that the government is entitled to prevail— for it is uncontroverted that the taxpayer would not have been entitled to a deduction, under the government's interpretation of the contract, without having made collection efforts that concededly were not made.

As a fallback argument, the government contends that the taxpayer would not be entitled to a deduction even if the taxpayer's right to receive the retained portion of the fee was contingent upon the closing of a permanent loan. Citing *Skilken v. Commissioner*, 420 F.2d 266 (6th Cir.1969), where we said that a loss deduction under § 165 "is concerned with actual economic loss," *id.* at 268, the government suggests that a failure to receive that which the taxpayer never had any right to receive cannot constitute an "actual economic loss."

We shall address the government's contentions in the order in which they were presented to us.

## A

■ The contractual provision under which all but $39,000 of the $175,000 builder's fee was to be "retained" by the partnership "until the closing of the permanent loan" proved comparable, as things turned out, to a provision to the effect that the partnership would not have to pay the full amount of the builder's fee until the closing of, say, the Delaware Water Gap, a work of nature not likely to be closed in our time. A provision of the latter sort would obviously be irrational, but it does not follow that what was apparently agreed to here was also irrational. There was a risk, when the construction contract was signed in 1972, that the permanent financing might be delayed or might fall through for some reason, but this was nothing more than a risk. It would not have been irrational for Hardaway Construction Company to agree to provide a measure of insurance against that risk, in effect, by promising to content itself with a reduced profit on the construction contract unless and until there was an actual closing on the permanent loan.

It may be true, as the government argues, that Hardaway Construction Company had no control over the partnership's obtaining permanent financing, notwithstanding that it was presumably within the construction company's power to complete the project before the expiration of Union Mutual's permanent financing commitment. That *datum* hardly suggests, however, that it would have made no sense for the Hardaways to let their construction company enter into a contract that was intended to mean what this contract appears literally to say. We have no way of knowing how eager the Hardaways were to be allowed to participate in the partnership venture, and we have no way of knowing how eager the Hardaways' construction company was to obtain work. (Anyone who owns a company of this kind has to worry about overhead, of course, in good times and bad; and when the construction business is less than robust, a contract that will help pay the overhead, help keep the company's work force together, and produce a small guar-

anteed profit to boot, can look very attractive indeed.) We do know that the negotiation of the construction contract was part and parcel of the negotiation of the deal under which the Hardaways were to become members of the partnership. We do know that the construction contract (which may or may not have been advantageous by itself) was described to Mr. Hardaway, in the letter agreement of September 29, 1971, as "your contribution"—for which contribution Mr. Hardaway and his father would become entitled to become part owners of the apartment project. It is entirely conceivable, against this background, that the Hardaways' "contribution" was intended to include their agreement to provide the partnership a $136,000 insurance policy against the permanent financing being delayed a short time, a long time, or forever.

Although it concedes that it would have been possible for the parties to specify in their contract that the retained portion of the builder's fee would be forfeited if the partnership failed to obtain permanent financing, the government maintains that "the contract in the instant case contains no *express terms* indicating that the taxpayer agreed to forfeit the retained portion of its compensation" in that event. (Emphasis supplied.) The government's problem, however, is that the express terms of the contract do say, without qualification, that the $136,000 "shall be retained until the closing of the permanent loan." The government repeatedly tells us that this provision "simply specifies the time of payment." If that is so, however, the partnership will never be obligated to pay the $136,000, because it is undisputed that the agreed time of payment will never come. It seems to us that the "express terms" argument favors the taxpayer, not the government.

The government submits, nonetheless, that it is reasonable to read into the contract by implication a provision to the effect that "when the partnership's last opportunity to obtain permanent financing lapsed ... [the partnership] incurred an obligation to pay the retainage." But the legal argument offered by the government for reading into the contract a provision that the parties did not put there requires us to ignore a provision that they did put there. "*In the absence* of a contractual provision specifying a time of payment," the government argues, "Tennessee law will imply a reasonable period of time ... so that when such a period of time has elapsed, the promissor must perform or be held to have breached the contract." In the contract before us here, however, there is *obviously no "absence" of a provision* specifying a time of payment; under the government's own analysis, Article 15.2 of the contract *does* specify a time of payment.

Without attempting to resolve this inconsistency, the government goes on to note that the letter agreement of September 29, 1971, provided that if permanent financing were obtained, and if the funds remaining after payment of the interim construction loan proved insufficient to pay the entire $136,000 retainage, Investment Associates would make up the deficiency. The government contends that the fact that the parties "went to great pains to insure that taxpayer would be paid for its services in the event that permanent financing was obtained" somehow supports the conclusion that the parties also intended that the taxpayer be paid in full in the event that permanent financing was not obtained. But if the parties intended that the fee be paid in full whether permanent financing was obtained or not, it seems odd, to say the least, that the parties should have taken such pains to insure payment only in the event that permanent financing was obtained, and not otherwise.

Assuming *arguendo* that the contract itself did not provide for payment of the $136,000 retainage unless and until a permanent loan should be closed, the government suggests that "taxpayer was entitled on a *quantum meruit* theory to receive the reasonable value of the services it rendered the partnership even in the absence of any contract between the parties." This, it seems to us, begs the question. The question is whether the construction company agreed, in its contract, that a stipulated portion of the builder's fee

would never have to be paid until such time as the partnership might obtain the proceeds of a permanent loan. The fact that the construction company would have been entitled to receive the full reasonable value of its services in the absence of a contract providing otherwise scarcely demonstrates that the particular contract at issue in this case did not provide otherwise.

Although the government asserts that the district court failed to resolve the question whether the contract provided that payment of the $136,000 retainage should be contingent upon the partnership's obtaining a permanent loan, we do not believe this is so. The taxpayer's case clearly rested upon the contention that payment of the builder's fee was contingent upon the owner closing a permanent loan, and in the second paragraph of its opinion the district court clearly explained what the taxpayer was contending. 661 F.Supp. at 153–54. The district court could not logically have entered judgment in favor of the taxpayer without having accepted the taxpayer's contention as to the proper interpretation of the contract.

The district court's interpretation of this Tennessee contract may not have been inevitable, under Tennessee law, but we believe it was permissible. The court's interpretation was consistent with the practical construction placed on the contract by the parties themselves—witness the failure of the taxpayer ever to demand payment of the retainage and the failure of the partnership ever to volunteer it. It would be shutting our eyes to the obvious, moreover, not to observe that the government's interpretation of the contract, unlike the court's, would result in the government's keeping more than $53,000 in taxes paid on "income" that the taxpayer never received and never will receive.

As was pointed out in the judgment order in the case involving the 1977 return, the government "denies that the builder's fee was a proper deduction in *any* year." (Emphasis supplied.) We are told that the period of limitations for amending the taxpayer's 1974 return expired before the present suit was filed. Unless a deduction could be taken in 1975, the year in which the partnership's last chance to obtain permanent financing expired, the taxpayer could never recover the taxes it paid on what proved to be phantom income.

There was no attempt in this case to obtain a tax benefit by artificially enhancing income in one year and enhancing deductions in a subsequent year. The government accepted the taxes paid on the retainage in 1974, and in refusing to give those taxes back "in any year," notwithstanding the certainty, from and after 1975, that the taxpayer would never actually see the income in question, the government is adopting a position that a moralist might be hard put to distinguish from that adopted by the late Mr. Brezhnev when he announced the doctrine that bears his name. This consideration would not have justified an interpretation of the contract inconsistent with its express terms, of course, but the curbstone equities may have left the district court feeling somewhat more comfortable than it might otherwise have felt about accepting a literal interpretation of the contract terms. In any event, we are not prepared to say that the district court's interpretation was wrong.

### B

Even if the construction company lost all hope of recovering the retained portion of its agreed fee when the permanent financing fell through in 1975, however, the government maintains that neither 26 U.S.C. § 166(a)(1) ("There shall be allowed as a deduction any debt which becomes worthless within the taxable year") nor 26 U.S.C. § 165(a) ("There shall be allowed as a deduction any [uncompensated] loss sustained during the taxable year") authorizes the deduction claimed here.

As to § 166, we agree; if the $136,000 never became a "debt" in the first place, it never became a worthless debt. Under § 165, however, assuming that all conditions of the pertinent treasury regulations are met, we think the phrase "any loss" is broad enough to authorize a deduction for

amounts reported as income in one year and lost in a subsequent year.

Treasury regulation § 1–165–1(b), as quoted by the district court, provides that: "[t]o be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events and * * * actually sustained during the taxable year. *Substance and not mere form shall govern in determining a deductible loss.*" (Emphasis supplied.)

The district court concluded, and we agree, that in the case at bar the taxpayer did actually sustain an uncompensated business loss in 1975. The loss was fixed by the complete collapse of the partnership's efforts to obtain the permanent financing which, had it been received, would have resulted in the taxpayer's receiving the retainage reported as income in 1974.

We are not persuaded that the taxpayer's failure to receive money that it had no matured right to receive cannot constitute a "loss," under § 165, even where such money has already been reported as taxable income. By specifying that "any" uncompensated loss sustained during the taxable year shall be deductible, the statute clearly invites us to do what the regulations confirm we must do: look to "substance" rather than to "mere form." The substance of what happened to Hardaway Construction Company, as we see it, is that the company accrued the unpaid portion of the builder's fee on its books in 1974, reported the unpaid fee as income for that year, and then in 1975 lost the money it had already reported as taxable income.

In form, perhaps, the government may be correct in arguing, as it does argue, that the contract interpretation advanced by the taxpayer is inconsistent with the assertion that the taxpayer correctly reported the retainage as taxable income on its 1974 return. We quote from the government's brief:

"If, as taxpayer has contended in the instant proceeding, its right to receive the retainage was only a contingent one, then it should not have reported any portion thereof in 1974, since all the events necessary to fix its right to receive its retainage had not occurred during that taxable year. Regulations Sec. 1.451–1(a). The appropriate remedy under that theory was for taxpayer to correct the error on its 1974 return by filing a claim for refund, asserting that the amount of the retainage should be excluded from its gross income for that taxable year."

If the regulations permitted us to analyze this case in terms of form rather than substance, however, the taxpayer would have every right to fall back on its own version of the Brezhnev Doctrine. The government has long since conceded, in the formal stipulation filed with the district court, that the full amount of the builder's fee was "properly reported" as gross income in 1974. We see no reason, under the circumstances of this case, why the taxpayer should be required to give back to the government a point that the government voluntarily and without qualification stipulated away.

### III

The question of contract interpretation on which this case turns is not necessarily as simple as it may seem on the surface. If the kaleidoscope through which the district court was invited to view the facts had been turned a little more or a little less, it is entirely possible that the court would have interpreted the contract differently. On the record before us, however, we are satisfied that the interpretation adopted by the district court was not beyond the pale. We are also satisfied that the end result—that the government will keep only the taxes due on the income the taxpayer actually received—is eminently fair to all concerned. The judgment of the district court is therefore AFFIRMED.

WELLFORD, Circuit Judge,
concurring in part and dissenting in part.

Judge Nelson has set out the factual background of this complicated tax case admirably. I believe the result reached here was influenced by the reflection in the

opinion that "the government's interpretation of the contract ... would result in the government's keeping more than $53,000 in taxes paid on 'income' that the taxpayer never received...." The taxpayer's inclusion of this amount in the 1974 return in dispute had to have been based on its assertion that it was entitled, or had a fixed, rather than a contingent, right to this income from the other party. The government did take the position by stipulation that it was "properly reported" in that year. The government's position is technical and "hardnosed;" however, even if taxpayer did not receive the income accrued and reported during 1974, Hardaway Construction Company did not establish under the tax laws that it "sustained a loss" in 1975.

Unfortunately, the taxpayer allowed the statute of limitations to run with respect to seeking a refund on the 1974 return. This was the correct procedure for it to follow in recouping the tax payment made in anticipation of income it never received. The taxpayer also had the opportunity to claim the payment from the developer under one construction of the contract, but failed or declined to do so, or even to seek a quantum meruit payment. It should be noted also that construction delays, which may have been attributable to taxpayer's lack of diligence, were a cause of the failure of permanent financing to materialize.[1]

I agree with the majority that taxpayer did not sustain its burden and claim of loss under 26 U.S.C. § 166, as the amount of claimed deduction in question was never a "debt." Taxpayer's assertion that the claim of loss is allowable under 26 U.S.C. § 165(a) is inconsistent with an assertion in the stipulation that it properly reported the retainage on the 1974 return as income. It is for the taxpayer, not the government, to prove that it is entitled to a refund. I find no alternative, therefore, although it is not the happy and equitable choice, but to disagree with the conclusion that taxpayer has established that it was entitled in 1975 to a deduction for a loss "actually sustained" and evidenced by "closed and completed transactions, fixed by identifiable events." I, accordingly, dissent from this aspect to the decision, and would reverse the decision of the district court.

tiff's] power to complete the project before the expiration of ... [the] permanent commitment."

---

1. The majority concedes that "it was presumably within the construction company's [plain-